# Supreme Court of Florida

_____

No. SC18-227
_____

**SEAN ALONZO BUSH,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

May 14, 2020

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const. In 2017, the appellant, Sean Alonzo Bush, was convicted in St. Johns County of the 2011 murder of his estranged wife, Nicole Bush. He was convicted under both the first-degree premeditated and felony murder theories and was also convicted of burglary of a dwelling with an assault and while armed with a firearm. The jury unanimously recommended that Bush be sentenced to death for the murder, and the trial court sentenced him accordingly. This direct appeal

followed. As we explain below, we affirm the defendant's convictions and sentence of death.

Additionally, we note that Bush's convictions in this case are wholly based upon circumstantial evidence. As in all death cases, the sufficiency of the evidence to support Bush's first-degree murder conviction is at issue, *see Caylor v. State*, 78 So. 3d 482, 500 (Fla. 2011), requiring that we consider the appropriate standard of review for this important evaluation. For many years, Florida has been an outlier in that we have used a different standard to evaluate evidence on appeal in a wholly circumstantial evidence case than in a case with some direct evidence. *See Knight v. State*, 107 So. 3d 449, 456-57 (Fla. 5th DCA 2013), *approved*, 186 So. 3d 1005 (Fla. 2016). As we will explain, we now join all federal courts and the vast majority of state courts in abandoning this special appellate standard, primarily for the same reason that Florida abandoned the special circumstantial evidence standard for use in instructing juries in 1981. *In re Standard Jury Instructions in Criminal Cases*, 431 So. 2d 594, 595 (Fla. 1981) (rejecting the special standard for evaluating circumstantial evidence as "confusing and incorrect") (quoting *Holland v. United States*, 348 U.S. 121, 139-40 (1954)).

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2011, Nicole Bush (Nicole) was brutally attacked in her Julington Creek townhome. Medical examiner testimony later revealed that she was shot six

times, then beaten and stabbed. Nicole initially survived the attack but succumbed to her injuries in a hospital hours later. The investigation revealed that her estranged husband, Sean Bush, was a significant person of interest in the murder, and it ultimately led to his arrest and indictment. The evidence presented at trial is summarized as follows.

## Guilt Phase

### *State's Case-in-Chief*

At 5:47 a.m. on Tuesday, May 31, 2011, an intruder used the master code to disarm the alarm panel in Nicole's Julington Creek townhome. About thirty minutes later, Nicole called her friend Tracie Walker for help but did not respond when Walker answered the phone. Thinking that Nicole had called her accidentally, Walker hung up the phone, but she was concerned about the unusual phone call and called Nicole back. When Nicole answered the phone, Walker heard her saying "help" and gasping for breath before the phone disconnected. Walker again tried to call Nicole, but the call went directly to Nicole's voicemail.

Walker then called a mutual friend, Lenora Jerry, and asked her to call Nicole. Nicole answered Lenora's phone call and asked for help, saying that she could not make it to the door. Jerry and Walker decided that Jerry, who lived closer to Nicole, would go to Nicole's home to check on her.

Jerry and her husband, Thalmus Billington, traveled together to Julington Creek and called 911 en route to ask that an officer be dispatched to Nicole's home to conduct a welfare check. When they arrived, Jerry observed that Nicole's garage door was up, and the door leading from the garage to the interior of the home was open. Jerry and Billington looked around the outside of the home and did not see any signs of forced entry. Then, they walked through the garage and the interior door into the kitchen, where Jerry called out to Nicole. Nicole did not respond, and Jerry and Billington walked outside and met the responding officer, Deputy Graham Harris.

After talking with Jerry and Billington, Deputy Harris entered the home and announced his presence. Upon hearing a mumbled voice coming from the second floor, Deputy Harris walked up the stairs and noticed red stains on the carpet. He walked to the master bedroom, where Nicole lay in a pool of blood. She was conscious but severely injured. Nicole asked for help and told Deputy Harris that she had been shot in the head. Deputy Harris asked Nicole who attacked her. She said she did not know, but she consistently referred to the attacker as a "he" or "him."

Paramedics arrived shortly thereafter and observed Nicole's "immediately life-threatening" injuries, including multiple gunshot wounds to her head, as well as bruising and severe swelling. They asked Nicole questions to determine her

level of orientation, and although she was generally unresponsive, she continued to ask for help and state that somebody shot her. Nicole was transported to the trauma center at Shands Hospital in Jacksonville, where she died at 8:51 a.m., shortly after arrival.

That afternoon, St. John's County Sheriff's Office Detective Sean Tice received instructions to contact and interview Nicole's husband, Sean Bush. Although Bush and Nicole were married at the time, they had separated and were living apart. Detective Tice and Deputy Jessica Hines went to Bush's home in Jacksonville, informed him of Nicole's death, and proceeded to interview him.

*Bush's First Interview: Afternoon of the Murder*

Bush explained that he and Nicole met while working for the same company. They married in 2002 and moved to Jacksonville in 2005. They had two minor sons, the younger who was their biological son and the older whom Bush had known since the child was two months old and later adopted. At the time of the murder, the boys were six and nine years old. Bush also had two older children, a son and a daughter who lived out-of-state.

Bush and Nicole started experiencing marital problems in 2006, and they lived apart from one another for several months. Although they reunited in 2007, they continued to have problems and eventually separated in 2009. Bush said that

he and Nicole had agreed to get divorced and that Nicole had obtained divorce papers.

Nicole and Bush shared in caring for the children, but Nicole was their primary caregiver.  Normally, Bush would keep them every other weekend, picking them up on Friday evening and bringing them home to Nicole on Sunday evening between 7 and 7:30 p.m.

In 2010, Nicole purchased the Julington Creek townhome where she and the children lived at the time of the murder.  Bush never lived there, but he frequently visited the children, and Nicole paid him to clean the home.  Bush did not have his own house key, but he had access to the spare key that Nicole hid in the garage.  Bush also knew the passcode to enter the garage from the outside.

Bush was asked to describe his activities in the days leading up to the murder.  The weekend before the murder was Memorial Day weekend, and Nicole was murdered the morning after the holiday.  Even though the children had spent the previous weekend with Bush, he said that he kept them again throughout the Memorial Day weekend because one of the boys was misbehaving and Nicole asked him to keep the children and the family dog.  Bush said that the plan was for him to keep the boys through the weekend and take them to school on Tuesday morning.

Bush explained that on Friday evening, he met Nicole at a restaurant to pick up the boys and then went to the townhome to pick up the dog and some items for the boys. By his account, this was the last time that he used the key to enter the townhome. On Saturday, he took the boys to get haircuts, and they returned to his house afterward and watched television. Bush said that he and the children did not go anywhere on Sunday. He also said that, on Monday, the day before the murder, he was at home with his children all day except for an afternoon trip to the grocery store, and the last time he spoke with Nicole was later that night. Bush said that he remained at home all night until it was time to take the children to school at approximately 7:15 on Tuesday morning. Later, however, he said he left home that morning to check gas prices while the children were getting dressed for school, but did not purchase any gas. He returned home after taking the children to school.

Bush said that at the time of the murder, he was dating a woman named Sharon Bennett, and he was good friends with a woman named Brenda Eckling (Brenda Daniels).[1] Bennett testified that she met Bush on the internet around 2009. She did not know that Bush was married at first; she found out on social media after knowing him for about one year. When Bennett confronted Bush via

---

1. At the time of trial, Brenda Eckling's name was Brenda Daniels. To be consistent with the trial record, she will be referred to by the last name "Daniels."

text message about his being married, Bush admitted to it but said that he was in the process of getting a divorce. Around New Year's Day in 2011, the two were discussing marriage. Bennett told Bush that she did not want to be his secret anymore and that he needed to finalize his divorce if their relationship was to continue. After that discussion, Bush showed Bennett some divorce paperwork, and she believed that the process was moving along.

When asked if he knew of anyone who might have a motive to kill Nicole, Bush suggested that Nicole's work as a collection agent might have given someone a motive.

Before the interview ended, Bush agreed to provide his cell phone to the St. Johns County Sheriff's Office for examination. Later that day, Bush took his phone to the sheriff's office, and Detective Tice interviewed Bush a second time while Bush waited for a detective to retrieve information from the phone. Tice asked Bush if he would provide a DNA sample, and Bush expressed concern that his DNA would be found throughout Nicole's house, saying: "I've been in every part of the house . . . I've been in the bedroom. I've been in the kids' room. I've been in the kitchen. I've cleaned the bedroom . . . I have handled probably everything in there from the toilets to the floors." After Detective Tice explained that DNA is used to both include and exclude individuals during an investigation,

Bush agreed to provide a sample.  Additionally, a gunshot residue kit was used on Bush's hands.

A visual inspection of Bush's upper body revealed no visible injuries. However, Detective Tice observed a mark on Bush's lower leg which Bush initially said was a mosquito bite and later in the interview said was a spider bite. Detective Tice also noticed that Bush was walking with a limp and asked Bush about it.  Bush said that while attending a company function, he broke his foot when he hopped off a stage in the excitement of winning a prize.

Bush again expressed concern about his DNA being in Nicole's house, and Detective Tice explained again that the location of an individual's DNA is an indicator as to whether the person was in Nicole's house for a lawful purpose. After Detective Tice left the interview room, Bush said to himself: "I'm going to jail.  I'm going to prison.  I'm going to prison."

*The Crime Scene*

The investigation of the crime scene confirmed that Nicole suffered a brutal attack.  Blood stains and blood spatter were found throughout her bedroom, and the attack was so intense that some of the blood spatter reached the ceiling.  Large quantities of blood were found on the bed, the floor, and the bedroom door.  Three bullet holes were found in Nicole's bloody pillow, and a projectile was retrieved

from her bedroom wall.  In addition to the evidence found in Nicole's bedroom, six bloody shoeprints were found in the living room.

*The Autopsy*

The autopsy, conducted by Dr. Jesse Giles, revealed that Nicole suffered three different types of injuries: gunshot wounds, blunt force injuries, and sharp force wounds.  Nicole's death was the cumulative result of the blood loss from all of her injuries.  She sustained six gunshot wounds, five to her head and one to her elbow.  One of the five head wounds went through Nicole's eyebrow and fractured the bone.  Dr. Giles explained that the bullet traveled through Nicole's right eyeball, ruptured it and caused immediate blindness.  The bullet then went into her mouth, where she swallowed it, and it passed into her small bowel.  The gunshot to Nicole's elbow was a superficial wound that could have been a defensive wound.  The gun was never found.

Additionally, Nicole sustained blunt force injuries to her head, face, and upper and lower extremities.  She suffered at least three blows to the top of her head that split her skull and bruised her brain.  The back of Nicole's shoulder revealed bruising and scraping, which indicated that she was hit with an object in that area at least three times.  Her left arm and shoulder revealed crushed tissue and torn muscle with a large area of hemorrhage, indicating a significant blow by a rod-like object.  The same arm also sustained a sharp force injury.  She also

- 10 -

sustained blunt force trauma to both of her knees, indicated by the same rod-like marking.  The blunt force injuries were consistent with having been hit with a baseball bat.

Moreover, sharp force injury occurred to Nicole's left leg, where she was stabbed above the knee.  She was also stabbed in her left breast and right arm, and there was an incision in her left arm.  The weapon used to inflict Nicole's sharp force injuries was never found.

Dr. Giles opined that the sharp force injuries occurred "late in the whole [series of] events" because there was very little hemorrhaging from those injuries.  The lack of hemorrhaging was due to her having "very little blood still inside her body and her vessels."

Dr. Giles further testified that Nicole "was definitely conscious through much of the attack."  He explained, "There again [were] three different types of wounds, but there's been multiple wounds of different types over multiple parts of her body and she has defensive injuries.  There's been a significant struggle that continued for some period of time here before she finally succumbed."  Nicole died from "hypovolemic shock due to multiple injuries, gunshots, blunt force and stab wounds."  Dr. Giles explained, "In laymen's terms she bled to death from being shot and having her skin torn in her head and other areas mashed and bruised to her body [sic] and then finally being cut."

*Firearm Testimony*

Although the gun used to shoot Nicole was never recovered, bullet fragments recovered from her head and from the wall in her bedroom were submitted to the Florida Department of Law Enforcement (FDLE) for analysis. Firearms examiner Peter Lardizabal examined the bullet fragment retrieved from the bedroom wall and testified that although the fragment was too badly damaged to conclusively link it to a particular type of firearm, it appeared to be a remnant of a .22 caliber piece of ammunition, "almost certainly a .22 long rifle, rimfire caliber design."

The largest bullet fragment recovered during the autopsy was also consistent with a rimfire .22 caliber cartridge design. An examination of Nicole's pillow revealed that the muzzle of the firearm was placed against the pillow when the shots were fired. The pattern created by the gunshots was also consistent with that of a rimfire caliber such as a .22 caliber long rifle.

*Bush as a Person of Interest*

Bush became a person of interest very early in the investigation. Within days of the murder, investigators began to focus on Bush, and evidence obtained over the course of the next three months resulted in his arrest in late August 2011. Investigations into Bush's whereabouts at the time of the attack, his return to the crime scene days after the murder, the connection between his shoes and the

bloody shoeprints left at the crime scene, and his dire financial situation all yielded incriminating evidence.

### 1. Bush's Whereabouts on the Morning of the Murder

Bush gave inconsistent statements about where he was when Nicole was attacked, and his statements conflicted with the testimony of trial witnesses. At the time of the murder, Bush rented a room in the home of Kathy Phillips. Phillips testified that on the day of the murder, she did not see Bush or his van when she left home between 6:15 and 6:20 a.m. to go to work. However, during his first interview with Detective Tice on the day of the murder, Bush first said that he was at home until 7:15 a.m. when he took the boys to school. Later in the interview, Bush said that he left home to check on gas prices while the boys were getting dressed but did not purchase any gas.

In a follow-up interview with Detective Tice the week after the murder, Bush said that the boys had not yet gotten up when he went to check gas prices. When confronted with his earlier inconsistent statement, Bush admitted that he did not go to check gas prices. Instead, he said that he went to see if his friend Brenda Daniels was home but found that she was not. Although Bush said that Daniels lived about ten minutes from him, Bush estimated that he was away from home for two hours. Daniels testified that she did not see Bush that morning.

During trial, the jury learned that a morning drive from Bush's home in Jacksonville to Nicole's home in Julington Creek—around the time that the attack occurred—was about thirty minutes each way. Bush's van was not spotted on any neighborhood surveillance videos during the period of time around the attack, but trial testimony indicated that a walk at a normal pace from the northern (back) gate of Julington Creek to Nicole's townhome took less than five minutes.

Records from Julington Creek Elementary School showed that on the morning of the murder, the Bush children checked into the school's extended day care program later than normal. Donna Hughes, one of the employees who worked with the program and was familiar with the children, testified that Nicole normally brought them to school. Hughes did not remember Bush having brought them to school except for that day.

The jury also heard a recorded call between Bush and his brother-in-law, Ramone Gregory. Gregory, a Tampa Police Department officer, placed a series of four phone calls to Bush in July and August 2011 and decided to record the conversations because he knew that Bush was a person of interest.[2] During the first phone call, Gregory said that he and his wife, Kim, talked about her last phone call with Nicole, which took place the day before the murder. According to Kim,

___

2. On cross-examination, Gregory acknowledged that he did not have a close relationship with Bush and that he was coordinating his phone calls with the St. Johns County Sheriff's Office.

Nicole told her that Bush wanted to keep the boys that weekend because he was depressed about not having a job.

## 2. Bush's Return to the Crime Scene

Investigators' suspicions surrounding Bush intensified in light of his behavior upon returning to Nicole's townhome several days after the murder, and his actions were especially incriminating in light of information learned from Nicole's relatives.

Sergeant George Harrigan testified that he met members of Nicole's family at the townhome a few days after the murder so that they could retrieve some items for the children, who were in their custody at the time. Harrigan asked them to walk around and see if any items were missing. They advised that Nicole's laptop was missing as well as an aluminum baseball bat that she kept by her bed for protection.

After learning this information, Harrigan searched Nicole's bedroom and moved a dresser, where he found a laptop and jewelry hidden underneath. The front of the dresser touched the floor, which would have prevented anyone from simply sliding the laptop and jewelry under it. Harrigan testified that the items could not have been placed there without significant movement of the dresser: "You'd have to pull [the dresser] out, put something there, pull it back forward or, possibly, remove the bottom drawer, place something, and put the drawer back in."

Additionally, having seen the bloody shoeprints in the living room that led to the sofa, Harrigan searched the sofa and found a baseball bat tucked in the crevice between the back of the sofa and the part that holds the lower cushions.

Detective Tice testified that Bush asked him about getting access to Nicole's home because he needed some items for the family dog. After Sergeant Harrigan discovered the hidden laptop, jewelry, and baseball bat, the investigators decided to allow Bush to return to the home with a key and document Bush's activity inside. A search warrant was obtained.

On June 4, cameras were used to set up surveillance in two areas of the home—in the living room facing the sofa, and in Nicole's bedroom facing the dresser. The cameras were set to detect pixel movement and begin recording. Because the cameras responded to a change in light, if the lights were off, the camera would not detect the movement and would not record. Thus, the lights were left on in the townhome so that the camera would interpret the pixel contrast as movement and begin recording.

After the cameras were installed, evidence tape was placed on the doors to secure the home. Detective Tice, who helped set up the cameras, returned to the Sheriff's Office and arranged for Bush to pick up the house key. Another detective checked the evidence tape at 8 a.m. and noon on June 5 and noted that it had not been tampered with. However, when he returned on June 6, the tape on the front

door had been broken. He retrieved the surveillance cameras and took them to the Sheriff's Office for examination.

Detective Vincent Russo testified regarding the surveillance videos. The first of two videos of the dresser showed the lights on in Nicole's bedroom. The second video, recorded later, showed the lights completely off in the bedroom except for a light that briefly appeared in the bottom right hand corner of the screen, which Detective Russo testified appeared to come from a flashlight. The first of two surveillance videos of the sofa similarly began with the living room lights on, and then, one of the lights was turned off. That video also showed the original position of the sofa cushion closest to where the baseball bat had been hidden. The second video, recorded later, demonstrated that the cushion was moved. A photo overlay of the sofa videos was also created to demonstrate the difference between the first and second images of the sofa and was published to the jury.

Sharon Bennett, whom Bush was dating at the time of the murder, was visiting Bush at his house on the night that he went to Nicole's townhome. She testified that around 10 p.m., Bush said that he was going out "to get some air," and leaving her behind, took her car. Bennett tried texting and calling Bush while he was gone but was unable to reach him until he was on his way home. When he returned after two hours, Bush did not immediately say where he had been, but

Bennett noticed that the passenger seat of her car had been pushed back and that there was debris on the seat. When she questioned him, he said that the debris was dog food and that he had gone to Nicole's house to get some items for the dog. Later however, Bush said that he looked around the townhome while he was there, and he used his flashlight to look around because he did not want anyone to see him. Bush also told Bennett that he parked her car around the corner from Nicole's home in an effort to avoid being seen by the neighbors.

### 3. Bush's Timberland Shoes

Another link between Bush and the murder was his collection of Timberland shoes. About one week after the murder, a search warrant was executed at Bush's home. Multiple pairs of Bush's shoes were collected and submitted to FDLE for analysis and for comparison with the bloody shoeprints found in Nicole's living room. Of the six bloody shoeprints found at the crime scene, five of them were suitable for analysis. Senior crime laboratory analyst Lynn Ernst testified that all five shoeprints corresponded with Bush's Timberland shoes.

Sharon Bennett testified that Bush normally wore Timberland boots and kept them neatly organized at his home. When shown the shoes that had been entered into evidence, she recognized each pair as belonging to Bush. However, Bush had a favorite pair of Timberland boots that appeared older than the others, and that

pair was not among those in evidence. Moreover, Bennett did not see those boots again after the murder.

### 4. Bush's Financial Situation

Bush's financial status was also a focus of the investigation, and multiple witnesses testified regarding Bush's dire financial status at the time of the murder. Bank records showed that Bush had five bank accounts at the time of the murder (two savings accounts, two personal checking accounts, and one business checking account). According to the account summaries for the period that included the date of the murder, two accounts had negative balances, one had a balance of $1.34, one had a balance of $13.85, and another had a balance of $277.

In the weeks leading up to the murder, Bush exchanged text messages with others in which he talked about his financial situation: "[T]he only thing that can really help me is money seeing how I'm seriously in need and owing child support . . . . A card with kind words are [sic] nice but not really gonna pay many bills so I'm at a bit of a loss." Bush described himself as "broke as a joke" and "bleeding straight out. Low cash."

Additionally, Kathy Phillips testified that when Bush moved into her home, he told her that he had an information technology job at a biomedical firm but that he needed a roommate because he was paying child support for four children. Bush was twice late paying his rent between February and April 2011, and in

March or April, Bush told Phillips that he was going to be late paying his rent because he had been laid off for several months. In April 2011, Bush's church paid his rent for him.

Bush was the primary beneficiary of Nicole's Minnesota Life group life insurance policy in the amount of $815,240. Sharon Bennett testified that shortly before Bush was arrested, which occurred in August of 2011, she was with him when he received a phone call from someone who said that he was calling from Nicole's job and wanted to remind Bush that Nicole had an insurance policy through her employer. After the phone call ended, Bush told Bennett what he knew about the policy. Bush gathered more details about the policy over the next few days and then spoke with Bennett about it again.

On July 20, 2011, however, Bush had called Minnesota Life to inquire about the policy. This phone call revealed that Bush was aware of Nicole's life insurance policy before he received the anonymous phone call. During the call, Bush stated that he was married to Nicole, and he wanted to verify that he was still the policy beneficiary, noting, "I know I was [listed as the beneficiary] years ago . . . ."

The claims representative confirmed that Bush was a beneficiary and informed him that a beneficiary statement had previously been mailed to him to initiate the recovery of insurance proceeds. However, the mail was returned to the insurance company. The representative advised that another beneficiary statement

would be mailed to him.  On July 26, after receiving the statement, Bush signed it and submitted it to Minnesota Life.

*Bush's Connection to the Murder Weapons*

In addition to the evidence surrounding Bush's statements, behavior, and life circumstances, Bush was heavily incriminated by DNA evidence obtained from the baseball bat and the sofa where the bat was hidden after the attack.  He was also incriminated by his computer searches, particularly those relating to firearm use, and specifically the use of a .22 caliber firearm.

*1. DNA Testing*

Multiple items were sent to FDLE for DNA testing along with comparison samples obtained from Nicole during the autopsy and provided by Bush and the two children.  Some of the DNA results excluded Bush.  For example, male DNA foreign to the Bush family was found on Nicole's laptop and on a blue towel in Nicole's bedroom, although FDLE DNA analyst Emily Martin explained that no testing existed to determine when DNA was left on an item.  FDLE's DNA testing on swabs obtained from the baseball bat, which evidence indicated was the murder weapon used to inflict Nicole's blunt force injuries, revealed a mixture of at least two individuals.  The major profile belonged to Nicole, but the minor profile was insufficient for inclusion purposes.

FDLE also tested DNA swabs obtained from the inside of the sofa where the baseball bat was hidden. These swabs also revealed a DNA mixture from at least two individuals. Nicole, Bush, and their biological son were all included as possible contributors to that mixture. The older son was excluded.

The baseball bat was sent to Virginia-based Bode Technology for further DNA testing. The results of Y-STR testing, which exclusively examines male DNA, showed that Bush's DNA matched the major component of the Y-STR profile found on the bat. Additionally, all the alleles from Bush's Y-STR DNA profile were found on the swabs obtained from the handle of the bat. Further, 99.961 percent of the male population and the entire female population were excluded as contributors to the Y-STR profile.

Bode Technology also conducted STR testing on the bat. The STR testing, which examines male and female DNA, revealed that Nicole and Bush could not be excluded as contributors to the DNA mixture found on the handle of the bat. Moreover, the testing involved a comparison of Bush's DNA profile and the DNA from the bat at thirteen genetic markers, and Bush's alleles were found at all thirteen markers. The statistical significance of those results was that 1 in 1 million U.S. Caucasians, 1 in 1.8 million U.S. African Americans, and 1 in 3.5 million U.S. Hispanics would be included as possible donors to the mixture. Moreover, six alleles in the mixture matched only Bush and not Nicole or their

biological son. Despite the presence of his DNA on the baseball bat, when questioned by Detective Tice, Bush denied any awareness of a bat being kept at Nicole's home.

*2. Computer Forensics*

Further incriminating Bush was evidence of searches that he conducted on his computers. The day after the murder, Detective Tice was supposed to meet Bush to pick up his laptop and desktop computer tower, but Tice was only able to retrieve the tower because Bush said the laptop was being repaired. Bush agreed to get the laptop from the repair person, and he provided it to the Sheriff's Office later that afternoon. However, in his June 8 interview with Detective Tice, Bush admitted that he had not taken the laptop to someone else for repair but had worked on it himself.

When the Sheriff's Office received Bush's laptop for examination, it was not functional. However, no viruses were found on the hard drive, which contained some remnants of files, all of which were date-stamped June 1, 2011, and most of which were time-stamped 3:02 p.m. The identical date and time stamps suggested that the computer was wiped clean, and then files were installed. After the examination was complete, the laptop and hard drive were returned to Bush, and a forensic image of the hard drive was retained as evidence.

In September 2011, following Bush's arrest, his laptop was seized again and re-examined. This time, the laptop contained a different hard drive. The examination of this hard drive as well as a subsequent examination in 2015 using the Internet Evidence Finder software revealed searches in January and February 2011 for the following terms: "silencer," "silencer + plan," "homemade suppressor," "how to make a homemade silencer/suppressor," "build a .22 caliber suppressor," "suppressors and silencers," and "build a .22 caliber suppressor." The 2015 examination also revealed that some terms, such as the word "silencer," were searched in a private browser and thus did not reveal a date or time for the search. The results also showed that when Bush searched the term "silencer," he chose the term "silencer plans" from a list of auto-populated results.

The examination of Bush's desktop revealed that on June 1, 2011, the day after the murder, Bush conducted a search for the term "blood." Additionally, during the months after the murder, but before his arrest, Bush searched the terms "unemployment loans with bad credit," "insurance loans," and "policy loans." He also searched the terms "first 48" and "forensic footprint wear analysis."[3]

---

3. "The First 48" is a television show that documents homicide investigations.

*The Verdict and the Penalty Phase*

Bush did not put on any evidence in defense. However, during closing statements, defense counsel argued reasonable doubt and challenged the identity of the perpetrator. The jury returned its verdicts on August 2, 2017, finding Bush guilty of first-degree premeditated and felony murder, and burglary of a dwelling with an assault and while armed with a firearm.

**Penalty Phase**

The State and the defense presented evidence during the penalty phase. Having previously filed its notice of intent, the State sought to prove five aggravating factors: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; (2) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of a burglary; (3) the capital felony was committed for pecuniary gain; (4) the capital felony was especially heinous, atrocious, or cruel (HAC); and (5) the capital felony was a homicide and was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). Testifying for the State were five witnesses: Cherise Conte-Bush (Bush's ex-wife); Sharon Bennett (Bush's girlfriend); Cynthia Thompson (Nicole's mother); Kimberly Gregory (Nicole's sister); and Tracie Walker

(Nicole's friend). Thompson, Gregory, and Walker were all victim impact witnesses.

Bush and Cherise Conte-Bush married in 1998. Their daughter was born the year before. In April 2000, the couple had planned a romantic evening at home, but Conte-Bush was tired and wanted to postpone the evening. Bush insisted on continuing with their plans and asked her to make sure their daughter was asleep by the time he got home. The daughter fell asleep in their bedroom. When Bush came home, he filled the bathtub for Conte-Bush, and she got into the tub. Bush washed her back and told her that he loved her, that she was a good wife, and that he wanted to have another child. He then told her that he had a surprise for her. Bush left the bathroom but returned to run some more warm water when Conte-Bush said the water was getting cold and she wanted to get out of the tub. Bush told her to close her eyes and left the bathroom again. Bush returned with an electrically charged rod and threw it into the tub. Conte-Bush's back began to burn, and she screamed and jumped out of the tub. Bush tried to push her back into the tub, and when she was able to position herself against the wall such that Bush could not push her back in, Bush started choking her. Their daughter, who was three years old at the time, awoke and opened the bathroom door. Bush closed the door and started choking Conte-Bush again. After their daughter opened the door again, Bush stopped choking Conte-Bush and claimed to hear voices. Conte-

Bush ran to the bedroom phone to call 911, but the phone was dead. She then ran to the kitchen and was able to call 911 and get help. The next day, Conte-Bush found a burnt rod under her daughter's bed. Bush was ultimately convicted of aggravated assault for his attack on Conte-Bush. At the time of the attack, Bush was the beneficiary of Conte-Bush's $100,000 life insurance policy.

Sharon Bennett was Bush's girlfriend at the time of the murder and at that time had been dating him for approximately two years. One morning, at least one year before the murder, Bush showed up at Bennett's house upset and in tears. Bush told her that something was going on in his life, and he wanted to get a gun and hurt Nicole. He mentioned that the apartment complex where Nicole lived at the time was dark, and he could go there to attack her. Bush asked Bennett to help him get a gun, but she refused to do so and told him to forget the idea.

The remaining witnesses for the State were victim impact witnesses. Nicole's mother, Cynthia Thompson, described the impact of Nicole's loss on her and her family, and a loss of happiness in her own life. Thompson said that she no longer enjoyed traveling and participating in family gatherings.

Nicole's sister, Kimberly Gregory, described the impact of the loss on her family, particularly on Nicole's children, niece, and nephews. Nicole's oldest son suffered from depression as a result of her death, and the youngest son had difficulty understanding that Nicole was gone forever.

Nicole's best friend, Tracie Walker, testified that Nicole's loss was traumatic and that she was deeply affected by it. Walker also worked with Nicole, who was known at work as "the cake lady" because she baked cakes for her coworkers on special occasions. Walker said that the loss of Nicole devastated their coworkers.

After the State concluded its presentation of penalty phase evidence, Bush offered evidence in mitigation and relied on thirty-four nonstatutory mitigating circumstances, many of which related to Bush's upbringing. The evidence presented by the defense included testimony from ten witnesses, a combination of lay witnesses and experts.

Bush's younger brother, Mark Bush, testified that while growing up in New Jersey, their living situation was unstable, and they moved many times with their mother, Dorothy. When they had nowhere to move to, they sometimes stayed with their aunt. On occasion, they slept at Penn Station in New York City. Once, they were robbed at gunpoint while moving their belongings in a shopping cart. Another time, they were evicted during the holidays and were taken in by a male stranger after he found them in the hallway of a downtown building.

Bush and Mark did not always attend school when their living situation was unsettled, and at times they did not have weather-appropriate clothing. When they walked to school, they worried about their personal safety and occasionally

witnessed violence. Bush ran away from home at least twice. They were exposed to drug dealing in one of their homes, and one of their childhood friends was murdered.

Bush and Mark's mother, Dorothy, tried to protect them from some of the dangers to which they were exposed. However, Dorothy appeared to suffer from paranoia and hallucinations, and she used drugs and alcohol. She had multiple relationships that involved the physical abuse of her and her sons, and Bush and Mark tried to protect her. Dorothy also engaged in prostitution to provide for the family. Mark believed that their mother treated him better than Bush because she liked Mark's father more. She treated them differently in terms of discipline, affection, and how she shared money with them.

Around the time that Bush and Mark were teenagers, the brothers were lured into an abandoned house by an older male teenager. The teenager told Mark to keep watch at the front of the house while Bush went with him to look at something. Mark heard a scuffle but decided to ignore it, thinking that Bush could take care of himself. After they left the house, Bush was distraught and would not tell Mark what happened. A year or two later, Bush admitted that he was sexually assaulted.

Mark did not graduate from high school, but Bush did. Bush attended technical school, received information technology training, and was a Microsoft specialist.

Bush's oldest son, Amir, testified that Bush had been married to his mother, but they divorced when he was about four years old. Amir had a sister who was Bush's daughter by another woman. Bush gave Amir fatherly advice and spent time with Amir and his sister at school functions, on trips and outings, and on the weekends. The amount of contact that Amir had with Bush lessened after Bush moved to Florida, but they remained in contact, and he knew Nicole and the younger children. Bush never spoke to Amir or his sister disrespectfully about their mothers or Nicole. Amir loved Nicole, and Nicole treated him and his sister as if they were her own.

Bush's first cousin, Noel Chambers, testified that Bush was vulnerable to being bullied when he was younger. Bush and his brother Mark wore used, worn clothing and were teased as a result. Their mother frequently asked family members for money. Bush, Mark, and their mother also lost their home in a fire.

Chambers recalled that Bush's mother did not work, and as Bush got older, he supported her financially. Bush worked in high school to support the family and continued to do so during his adult years. During Bush's last conversation with his mother, they argued about money. About two weeks later, he found her

decomposed body in her apartment after being contacted by neighbors. Bush was distraught after her death. Bush tried to emulate Chambers' mother, who was his aunt, by bringing the family together and trying to keep in touch with family members.

Chambers never saw Bush with his father, but Bush was a very involved father with his own children. He recalled Bush spending a lot of quality time with Amir and the other children. Also, Chambers became closer to Bush during their adult years, and Bush became a mentor to him when his parents passed away.

Bush asked Chambers for money before Nicole's murder. Chambers also knew that Nicole had a life insurance policy and knew that Bush was aware of it. After Bush was arrested, Chambers cared for Bush's pets.

Brenda Daniels testified that she dated Bush for two-and-one-half years, but they did not date exclusively. Bush gave her advice and tried to help her with family problems. He tried to be a father figure to Daniels' daughters and encouraged them to respect Daniels. She helped Bush financially, including helping him buy a car.

Juliet Hart was a fourth-grade teacher at Julington Creek Elementary who taught the older of Nicole and Bush's sons. The son started to have academic problems, and she contacted Nicole and Bush. Bush attended all the parent-teacher conferences, and he volunteered in the classroom.

Jack Lalonde's twenty-one-year-old son, Daniel, was charged with murder and held in the St. Johns County Jail during the time that Bush was also held there. Daniel and Bush became friends, and Bush gave him advice. Lalonde testified that Bush helped inmates with paperwork and participated in religious services. Bush also encouraged Daniel, who had become associated with a "rough crowd," to listen to Lalonde. Lalonde also had positive conversations with Bush and placed money in Bush's canteen account at Daniel's request.

Prison expert James Aiken classified Bush as a compliant inmate who could be managed in a prison environment, but he said that the nature of Bush's crime would require maximum security for the safety of the public. Aiken considered Bush potentially vulnerable in a prison setting because he was older than most of the other inmates, and because his conviction was for a crime of domestic violence. Aiken predicted that Bush would positively impact other inmates, especially the younger, immature population, and possibly teach inmates how to read.

Amy Nguyen, a geographical information system analyst, relied on census and mapping data to study risk factors in the Newark (Essex County), New Jersey, area where Bush grew up. Nguyen found multiple risk factors, such as an abundance of single-mother homes, lack of educational attainment, unemployment, and poverty.

Dr. Jethro Toomer, a clinical and forensic psychologist, testified for the defense but did not interview Bush. He was provided the maps created by Amy Nguyen, as well as Bush's school and family records. He also interviewed Bush's brother, Mark; Bush's uncle; and one of Bush's ex-wives. Dr. Toomer testified that Bush grew up in an unstable community. He described the environment as one where individuals would not know what would happen in their lives from day to day. According to Dr. Toomer, because Bush moved an estimated fifteen times in ten years, the instability in the family's living situation would have triggered hypervigilance, a fight-or-flight mode, and a chronically elevated stress level. Dr. Toomer suggested that a child in Bush's position would have suffered from toxic stress syndrome. He described Bush's life as one of complex trauma due to the multiple instances and duration of trauma, and he testified that Bush suffered through a series of what Toomer described as man-made traumas. Dr. Toomer stated that the complex trauma and toxic stress syndrome would have resulted in delayed secondary thought processes, deficits in problem solving, lack of continuity in employment, and problematic interpersonal relationships.

Dr. Janice Wilmoth, a neuropsychologist, was the last mitigation witness. She reviewed Bush's school records, spoke to Bush's ex-wife, and observed the testimony of Bush's son and brother. Dr. Wilmoth did not interview Bush and was instructed not to talk with him. Dr. Wilmoth also examined the background of

Bush's mother, Dorothy. Dorothy, who died in her fifties, was confirmed by the Social Security office as a schizophrenic and received Social Security disability benefits. Dr. Wilmoth's testimony focused on the qualities of schizophrenia and the impact on the children of a schizophrenic parent. From second through eighth grade, Bush missed hundreds of days of school, and he attended fifteen different schools.

*Jury Recommendation and Spencer Hearing*

The jury unanimously found the existence of all five aggravating factors argued by the State. The jury rejected ten of the thirty-four mitigating circumstances as not proven by the greater weight of the evidence, and it found the remaining mitigation by varying vote counts. During the *Spencer*[4] hearing, the defense presented evidence in support of additional nonstatutory mitigating circumstances. Additionally, Bush spoke briefly and maintained his innocence. The State did not present additional testimony at the hearing but did offer four additional victim impact statements over defense objection.

**Sentencing**

The trial court ultimately sentenced Bush to death for the murder. The following aggravating factors were unanimously found by the jury, which also

---

4. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

found that the aggravating factors were sufficient to warrant a death sentence. Bush's sentence was based on the following aggravating circumstances: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person (great weight); (2) the capital felony was committed while the defendant was engaged, or was an accomplice, in the commission of a burglary (great weight); (3) the capital felony was committed for pecuniary gain (great weight);[5] (4) HAC (great weight); and (5) CCP (great weight).

While the defense did not seek to prove any statutory mitigating circumstances, the trial court found the existence of thirty-four nonstatutory mitigating circumstances.[6] Additionally, the trial court considered additional

---

5. The trial court noted that improper doubling did not occur with the trial court's finding of both murder in the course of a burglary and pecuniary gain, because each was based on separate facts.

6. The following mitigating circumstances were unanimously found by the jury and given the following weights by the trial court: (1) Bush was subjected to chronic poverty, improper clothing, homelessness including but not limited to sleeping in a train station, and hunger; he had a chaotic and unstable childhood, in part because of evictions, fire, poverty, and moving (moderate weight); (2) Bush experienced chaotic frequent changes of childhood homes and schools (moderate weight); (3) Bush and his brother saw alcoholism firsthand (slight weight); (4) as a child, Bush suffered a major trauma by being sexually molested by a juvenile in his neighborhood (moderate weight); (5) as a teenager, Bush worked to support his mother and brother (slight weight); (6) adults, agencies, school systems, pediatricians, etc., that were designed to protect Bush failed to intervene (slight weight); (7) Bush's family never owned a car (less than slight weight); (8) Bush missed a great number of school days and received poor grades in elementary

school and high school, but went on to graduate from high school and obtain I.T. certifications (slight weight); (9) Bush was abandoned by his father and did not have a male role model as he grew up to set an example; Bush was present in his children's lives in ways he never experienced with his father (moderate weight); (10) Bush overcame a chaotic childhood and dysfunctional family life to make real achievements in his own life; he provided emotional/financial support for his children and achieved good employment and an education (moderate weight); (11) Bush had nearly consistent periods of employment since high school until he lost his job in 2010 (slight weight); (12) Bush was crushed when his mother passed away and that he was not there for her (slight weight); (13) the passing of Bush's aunt was difficult for him; she was his second mother; Bush tried to copy his aunt and bring the family together (slight weight); (14) Bush has family (brother, children, cousin, and friends) who love and care about him; he has the capacity to form loving relationships with family and friends; and he has the support of his family (slight weight); (15) Bush has provided mature advice to friends and family (slight weight); (16) Bush has a special bond with and love for his children, treating both biological and adopted children as equals, and all four of his children have his last name (less than slight weight); (17) Bush volunteered his time inside his son's classroom; he was a positive influence in the classroom; he would assist with dropping off misplaced homework for his son (slight weight); (18) Bush can continue a relationship with his children; Amir Bush testified that he desires to have a relationship with his father while his father is incarcerated (slight weight); (19) Bush has been a positive influence on county jail inmates like Daniel Lalonde with life advice to listen to his father and by helping inmates with their paperwork (slight weight); (20) Bush participated in religious services at the St. Johns County Jail (slight weight); and (21) Bush demonstrated appropriate courtroom behavior throughout the course of the proceedings (less than slight weight).

The following circumstances were found by a majority of the jury by varying vote totals and given the following weights by the trial court: (22) Bush was raised in and witnessed ongoing violence in drug- and crime-infested neighborhoods of Newark, New Jersey, such that he often had to watch over his shoulder for crime (11-1 jury vote; moderate weight); (23) Bush suffered from physical abuse and emotional deprivation and was emotionally abused by a mother who was mentally ill and intentionally treated him with less love than his brother (10-2 jury vote; moderate weight); (24) Bush was subjected to domestic violence and witnessed multiple events of domestic violence upon his mother (11-1 jury vote; slight weight).

nonstatutory mitigating circumstances that were not presented to the jury but

presented to the court at the *Spencer* hearing: (1) residual doubt of Bush's guilt for

the murder of Nicole; (2) the State's pretrial offer of life imprisonment; (3) the cost

of a death sentence versus life imprisonment; and (4) a life sentence will provide

the victim's family with closure.  However, the court rejected each one as

inappropriate mitigation and, accordingly, assigned each no weight.

---

The following circumstances were rejected by the jury as not established by the greater weight of the evidence.  However, the trial court found the existence of each one and assigned weight accordingly: (25) Bush's mother had to turn to prostitution to provide shelter and food for him and his younger brother, and she brought the children with her to a pimp's house where she engaged in prostitution (slight weight); (26) Bush was known as an outcast as a child and teen because he wore secondhand clothes and had a "techy/nerdy" personality (less than slight weight); (27) Bush had a strong work ethic, useful occupation, and strong skill set in the area of technology (slight weight); (28) Bush is helpful to people outside of his immediate family by providing advice to younger cousins and to the children of friends to live lawful lives and respect their parents (slight weight); (29) Bush has many positive qualities, including (a) a sense of humor and a caring nature toward friends and relatives; (b) being a good listener and able to provide sound advice; and (c) caring about animals (less than slight weight); (30) Bush demonstrated good behavior in the St. Johns County Jail for six years prior to this conviction; Bush had only one disciplinary report; in custody Bush is a nonviolent and compliant inmate; he has had no problems with female staff; he will likely function well in the controlled environment and he will adjust well to prison (moderate weight); (31) a life sentence without parole in a prison setting will protect society from Bush (slight weight); (32) in a structured and controlled prison setting, Bush is not likely to engage in criminal behavior (slight weight); (33) Bush has the potential for rehabilitation (slight weight); and (34) Bush is amenable to a productive life in prison where he can help inmates with paperwork, assist other inmates to improve themselves, teach illiterate inmates how to read, and mentor and encourage inmates to live law-abiding lives when they leave prison (moderate weight).

On December 21, 2017, Bush was sentenced to death for the murder and to a concurrent life sentence for the burglary.  This appeal followed.

## ANALYSIS

Bush raises thirteen issues in this direct appeal.  Additionally, although Bush did not raise the issue of proportionality, after addressing the issues presented, we also evaluate the proportionality of his death sentence as compared to other cases where the death sentence has been imposed.

### 1. Sufficiency of the Evidence

Bush first argues that the evidence presented at trial was legally insufficient to support his conviction for first-degree murder.  Even apart from Bush's argument, this issue is before the Court because we must independently evaluate each death case for sufficiency of the evidence relied upon to convict the defendant.  *See Caylor*, 78 So. 3d at 500.  Bush correctly argues that the State's case is based on entirely circumstantial evidence and then asks us to review the evidence according to the special standard of review we have previously applied to wholly circumstantial cases.  Because this special standard is unwarranted, confusing, and out of sync with both the jury instructions currently used in this state and the approach to appellate review used by the vast majority of the courts in this country, we discontinue its use.

a. Standard of Review

The history of Florida's use of a special standard for circumstantial evidence cases is fully explained in the Fifth District's opinion in *Knight*, 107 So. 3d at 455-57. In summary, there was a time when all federal courts and almost all state courts instructed juries using a special standard when the evidence of a defendant's guilt presented at trial was circumstantial. *Id.* at 455-56. In 1954, however, the United States Supreme Court called the standard into question, opining that "where the jury is properly instructed on the standards for reasonable doubt, such an additional instruction on circumstantial evidence is *confusing and incorrect*." *Holland*, 348 U.S. at 139-40 (1954) (emphasis added). The Supreme Court further explained:

> Circumstantial evidence . . . is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more.

*Id*. at 140.

In the wake of *Holland*, all federal courts and most state courts ceased use of the special circumstantial evidence instruction and its corresponding standard of review on appeal. *Knight*, 107 So. 3d at 456. This Court eliminated the special

instruction for Florida juries in 1981, citing *Holland*, *see In re Standard Jury Instructions in Criminal Cases*, 431 So. 2d at 595, but inexplicably and without analysis continued using the corresponding standard of review for appellate purposes. *See Knight*, 107 So. 2d at 456. As a result, Florida became an extreme outlier with a "somewhat discordant" position that the special standard should not be used to instruct the jury but should be used to judge the jury's verdict. Irene Merker Rosenberg & Yale L. Rosenberg, *"Perhaps What Ye Say Is Based Only On Conjecture"—Circumstantial Evidence, Then and Now*, 31 Hous. L. Rev. 1371, 1419 (1995). The Texas Court of Criminal Appeals has explained the discordance in this approach and why it should not be accepted as follows:

> As we have emphasized on numerous occasions, the sufficiency of the evidence must be measured against the jury charge. Given the fact that a jury is to be guided by the charge in reaching their verdict, and given the fact that juries are no longer instructed on the law of circumstantial evidence, it no longer makes sense for appellate courts to use the circumstantial evidence "construct" to review the jury's verdict and to determine, thereby, whether the jurors acted "rationally." To do so evaluates the jurors' rationality by a different standard than that by which they were instructed to reach their verdict.

*Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991) (citations omitted), *overruled in part on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000).

The special standard is most often articulated by Florida's appellate courts this way: "Where the only proof of guilt is circumstantial, no matter how strongly

the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." *Knight*, 107 So. 3d at 457 (quoting *State v. Law*, 559 So. 2d 187, 188 (Fla. 1989)). In *Knight*, the Fifth District fully explained why this standard is confusing and incorrect as both a jury instruction and an appellate standard of review, *id.* at 457-61, and we see no need to repeat that explanation here. However, it should be obvious that it wholly defies reason to suggest that a standard for determining whether evidence is sufficient for conviction is incorrect if used by a juror, as we concluded in *Standard Jury Instructions in Criminal Cases*, 431 So. 2d at 595 (quoting *Holland*, 348 U.S. at 139-40), but appropriate for use by a judge to determine whether the verdict complies with the law.

The standard of review historically applied to a determination of the legal sufficiency of evidence to support a criminal conviction, at least where there is some direct evidence, is simply whether the State presented competent, substantial evidence to support the verdict. *Tibbs v. State*, 397 So. 2d 1120, 1123 (Fla. 1981); *Spinkellink v. State*, 313 So. 2d 666, 671 (Fla. 1975). To apply this standard to a criminal case, an appellate court must "view[] the evidence in the light most favorable to the State" and, maintaining this perspective, ask whether "a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Rogers v. State*, 285 So. 3d 872, 891 (Fla. 2019) (quoting

*Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)); *see also Tibbs*, 397 So. 2d at

1123 ("[T]he concern on appeal must be whether, after all conflicts in the evidence

and all reasonable inferences therefrom have been resolved in favor of the verdict

on appeal, there is substantial, competent evidence to support the verdict and the

judgment."); *accord De Groot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957)

(defining "[s]ubstantial evidence" as "such relevant evidence as a reasonable mind

would accept as adequate to support a conclusion" and instructing that evidence is

"competent" if it is "sufficiently relevant and material").  This standard should now

be used in all cases where the sufficiency of the evidence is analyzed.[7]

### b. Application

Turning now to the evidence presented in this case and viewing it in the light

most favorable to the State as the prevailing party, we readily conclude that "a

rational trier of fact could have found the existence of the elements of the crime

beyond a reasonable doubt."  *Rogers*, 285 So. 3d at 891 (quoting *Bradley*, 787 So.

2d at 738).  Indeed, if we were to reject the jury's verdict and the reasonable

---

7. Although we have sometimes explained the special standard for circumstantial cases in such a way as to indicate that it is ultimately a mechanism for determining whether the evidence constitutes a competent, substantial basis for the verdict, *see Wright v. State*, 221 So. 3d 512, 520-21 (Fla. 2017), for the reasons explained by the Fifth District in *Knight*, 107 So. 3d at 458-61, in practice, this special standard is more likely to cloud the judgment of an appellate court than to facilitate a proper analysis of whether the evidence is legally sufficient to support the verdict.

inferences the jury must have drawn from the evidence to reach that verdict, we would, in effect, be saying that a jury is required to entertain "a mere possible doubt, a speculative, imaginary, or forced doubt," contrary to the standard jury instructions given in all criminal cases. *See* Fla. Std. Jury Inst. (Crim.) 3.7.

According to evidence presented in this case, a few months before the murder, Bush began researching how to make silencers and homemade suppressors for a .22 caliber weapon—the same caliber of weapon that the firearms examiner testified "almost certainly" fired. Bush unsuccessfully tried to delete evidence of his searches and initially tried to avoid submitting his laptop for examination.

The murder occurred in Nicole's home without any signs of forced entry during a time when Bush knew the children and family dog would not be home to witness it or intervene. Bush would not have needed to force entry into the home, as he knew the passcode to enter the garage, the whereabouts of the spare house key, and how to operate the alarm panel. Bush knew the children and dog would not be home at the time of the murder because he was keeping them for the long weekend through the time the children were due back at school, an arrangement that testimony from a school employee suggested was unusual for the Bush family.

On top of these highly suspicious circumstances, Bush's landlord, who lived in the same home with Bush, testified that she did not see either Bush or his van when she left for work between 6:15 and 6:20 a.m. on the morning of the murder—

approximately thirty minutes after Nicole's alarm panel was disabled. Thus, evidence was presented that Bush was absent from his home around the time of the murder, which was also early on a school morning when his two young sons were staying with him. Not only was Bush absent from home at that time, but he first said that he was home and later gave inconsistent accounts of his whereabouts outside the home. One of those accounts was that he went to see if Daniels was home, but she was not. Bush said that Daniels's home was a ten-minute drive away but that he was away from his home for a couple of hours. As a result, Bush created a two-hour window of time for which he could not account. During that time, Bush had ample time to drive to and from Julington Creek to carry out the murder.

Further, five bloody shoeprints on the floor in Nicole's living room were consistent with the soles of Bush's favorite pair of shoes, which was never found by law enforcement and which, according to Sharon Bennett, Bush did not wear after the murder.

Several days after the murder, Bush returned to Nicole's townhome and went to two locations in the home that would have been significant only to the person who murdered her: the sofa where the baseball bat had been hidden and the dresser below which the laptop and jewelry were hidden. Moreover, Bush's DNA

was found in the sofa crevice where the murderer hid the baseball bat, one of the three murder weapons.

Most tellingly, Bush's DNA was the minor profile identified on the baseball bat used in the murder, which Bush claimed to have never touched.

During the months leading up to the murder, Bush was in severe financial distress, unable to pay his rent on time, responsible for paying child support, and asking others for money. Bush expressed that he was "broke as a joke" and low on cash. Bush was the beneficiary of Nicole's $815,240 life insurance policy, and he was aware for some time prior to the murder that he had been designated as the policy beneficiary. Several weeks after the murder, Bush called to confirm his beneficiary status and subsequently submitted a claim for the policy proceeds.

Because a rational trier of fact could, and did, find from this evidence that Bush committed the first-degree murder of Nicole under both premeditated and felony murder theories, Bush is not entitled to relief.

### 2. Richardson Hearing

Bush argues that testimony offered by the State's DNA expert, Emily Martin, constituted a discovery violation under *Richardson v. State*, 246 So. 2d 771 (Fla. 1971). At trial in 2017, Martin testified regarding the results of DNA testing conducted in 2011 and 2012 on Nicole's laptop and on a towel found in her bathroom. Martin testified that each item contained a major and a minor DNA

profile; the major profile belonged to Nicole, and the minor profile contained male DNA that was foreign to the entire Bush family. While Martin indicated that there was no test available to determine when the DNA was left on the towel, she testified that the results conclusively excluded Bush as a contributor to the minor profile. Martin's deposition testimony was consistent with these conclusions.

The testing conducted in 2011 and 2012 was the only DNA testing done on the laptop and the towel. After Martin testified to those results, the prosecutor asked Martin whether, using current methods of reporting DNA results, she would reach a different conclusion with respect to the minor profile. Martin stated that due to the limited amount of DNA that was available for analysis, she would report the minor DNA profile results as uninterpretable. Nonetheless, Martin testified that under either the earlier or the later reporting standards, Bush was excluded from the minor DNA profile because the DNA contained an allele that was foreign to the entire Bush family. In light of Martin's testimony regarding the revised reporting methods, defense counsel objected and asserted a discovery violation. The trial court then conducted a limited *Richardson* inquiry and ultimately concluded that no discovery violation occurred.

We agree with the trial court and conclude that no discovery violation occurred because the trial testimony did not constitute a material change to Martin's deposition testimony. Martin's conclusion about the testing conducted in

2011 and 2012—that Bush was excluded as a contributor to the minor profile—did not change. Martin testified as to the reliability of those results and did not waver from that conclusion. While Martin did state that if evaluated at the time of trial the results would have been reported as inconclusive, she reaffirmed that those reporting methods would not change the conclusion that Bush remained excluded as a contributor. Bush is not entitled to relief.

### 3. Dying Declaration

Bush argues that the trial court erred when it excluded from evidence, as inadmissible hearsay, *see* §§ 90.802-.803, Fla. Stat. (2017), a statement Nicole made to a first responder on the scene of the attack. Specifically, Nicole told the first responder that her children were with their father, and Bush contended that this statement met the exception to the hearsay rule for a statement made "under belief of impending death," § 90.804(2)(b), Fla. Stat. (2017), also known as a dying declaration. We review the trial court's ruling for abuse of discretion, *see Williams v. State*, 967 So. 2d 735, 746 (Fla. 2007), and find none.

A dying declaration is "a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death." § 90.804(2)(b). "The deceased must have known and 'appreciated his condition as being that of an approach to

certain and immediate death,' although it is not necessary that the declarant 'make express utterances' that he would never recover." *Hayward v. State*, 24 So. 3d 17, 30 (Fla. 2009) (quoting *Henry v. State*, 613 So. 2d 429, 431 (Fla. 1992)).

There is no dispute that Nicole reasonably believed that her death was imminent, as she had been grievously wounded and did indeed die approximately three hours after the attack. The issue is whether the statement that the boys were with their father concerned the physical cause or instrumentalities of what Nicole believed to be impending death or the circumstances surrounding her impending death. § 90.804(2)(b). We agree with the trial court that it did not.

The trial court considered the admissibility of this statement at a pretrial evidentiary hearing. Nicole made the statement in question to Deputy Harris after he entered the townhouse as the first officer on the scene. He made sure there was no one on the first floor of the home and then went upstairs, where he saw Nicole in the master bedroom. He asked her questions, communicated with dispatch, and then returned to clearing the house so that fire and rescue personnel could safely enter. At some point during this process, he asked Nicole where her children were, and she said they were with their father. Although Nicole was gravely injured and asking for medical help at the time of this statement, there was no indication in Deputy Harris's testimony that Nicole's statement as to her children's whereabouts related to, or was intended to relate to, the physical cause, instrumentality, or

- 48 -

circumstances surrounding her impending death. Rather, Deputy Harris's testimony indicates that this statement was a response to a logistical question. Therefore, it was reasonable for the trial court, who had the benefit of Deputy Harris's live explanation of how the statement came to be made, to find that this statement did not meet the dying declaration exception and exclude it as inadmissible hearsay.

Bush contends that when viewed together with another statement that the trial court did find to be a dying declaration, Nicole's statement that the children were with their father is indeed a statement related to the cause of her impending death and the circumstances surrounding it. Specifically, the trial court ruled that Nicole's statement to Deputy Harris that she did not know who attacked her qualified as a dying declaration, and this statement was admitted into evidence. Bush contends that Nicole's statement that her children were with him, which was made shortly before the statement that she did not know who attacked her, establishes the significance of the second statement by showing that she was fully conscious and capable of memory at the time. Further, and by extension, he contends that the two statements, when considered together, raise the inference that he, the children's father, was not the attacker.

However, we do not agree that these two statements are so related that the trial court had to consider them together for the purpose of deciding whether they

- 49 -

meet the dying declaration exception to the hearsay rule. *Cf. Torres-Arboledo v. State*, 524 So. 2d 403, 407 (Fla. 1988) (holding that only one half of a statement made by the decedent was admissible under the hearsay exception for a statement made for the purpose of medical diagnosis or treatment). Each statement was in response to a separate question asked by Deputy Harris and each was properly analyzed based upon the theory of admissibility Bush argued. Nicole's statement that she did not know her attacker was clearly related to the physical cause or instrumentalities of death or circumstances surrounding impending death and, therefore, was properly admitted as a dying declaration. However, her statement that the boys were with their father was not so related. Bush is not entitled to relief on this issue.

### 4. Law Enforcement Officer Testimony

Bush argues that the trial court: (1) should not have allowed the jury to hear Detective Tice's views on Bush's guilt, and (2) should have permitted the defense's proposed jury instruction instead of the standard instructions related to the testimony of law enforcement officers. At trial, multiple recordings of interviews with Bush were published to the jury. During some of these interviews, Detective Tice included false information. For instance, Tice told Bush that the surveillance video from the townhome was enhanced by NASA and clearly showed Bush reaching into the sofa and looking under the dresser. Tice also told

Bush there was proof that he turned off his cell phone locator on May 28 before the murder and turned it back on afterward on June 1. On cross-examination, Tice conceded that he misled Bush about the NASA enhancement of the video in order to get a reaction from Bush. He also conceded that his assertion regarding the cell phone locator was undermined by another detective's trial testimony that the download of phone information was incomplete.

Defense counsel filed a pretrial motion to prohibit the publication of any statements by prosecutors or law enforcement relating to Bush's guilt. The trial court held a pretrial hearing on the issue and ruled that the statements were admissible because law enforcement may "bluff" to elicit responses from an individual.

At trial, a total of four recorded interviews between Bush and Detective Tice were published to the jury. Before the first recorded statement was published, another discussion was held regarding the defense's proposed jury instruction. The trial court placed the instruction in the record but ruled that standard jury instructions 2.2 (Instruction on Edited Recording), 2.6 (Use of Transcripts and Recordings), and 2.8 (Recorded Interview (Effect of Law Enforcement Statements on the Defendant)), would be read to the jury.

Statements expressing "a witness' opinion as to the credibility, guilt, or innocence of the accused" are generally inadmissible. *Jackson v. State*, 107 So. 3d

328, 339 (Fla. 2012) (citing *Seibert v. State*, 923 So. 2d 460, 472 (Fla. 2006)). Because of their potential prejudice, such statements are inadmissible except to place the defendant's statements in context. However, where Detective Tice's statements did not amount to improper personal opinion and were designed to elicit relevant responses from Bush, Bush is not entitled to relief.

The discussion about the video and Detective Tice's statements suggesting that Bush behaved suspiciously when he entered the townhome were a part of reasonable questioning by a law enforcement officer. Investigators were aware of bloody footprints that were consistent with shoes seized from Bush's bedroom. They were aware of his re-entry into the townhome, the movement of the sofa cushion, and the lights having been turned off while he was there. In the interview, Bush's description of his actions evolved from him denying looking in the sofa, to being "pretty sure" that he did not reach in the sofa, to saying that he may have looked under the sofa or the chair for a telephone that was not sitting on its receiver.

The exchange between Bush and Detective Tice did not involve personal opinions or prejudicial expressions of guilt. The questioning obtained relevant responses because Bush's account of what he did in the townhome evolved throughout the conversation from no contact with the sofa to looking under it. Additionally, on cross-examination, Detective Tice admitted that he was bluffing

- 52 -

about the NASA enhancement. Thus, the jury was aware that he was not telling the truth about Bush being seen on the video.

Similarly, Detective Tice's statement in an earlier interview about Bush turning off the cell phone locator was intended to elicit responses from Bush about his manipulation of electronic equipment. Bush denied turning off his cell phone locator but admitted to installing updates on his phone. Defense counsel cross-examined Detective Tice and was able to undermine the suggestion that Bush turned off his cell phone locator. However, the conversation about the cell phone locator immediately preceded a discussion during the interview about Bush's laptop where Bush admitted that it was not out for repair when Detective Tice came to pick it up the day after the murder.

The statements made by Detective Tice fall far short of the prejudicial statements in *Jackson v. State*, 107 So. 3d 328 (Fla. 2012). In *Jackson*, this Court held that the admission of Jackson's videotaped interrogation constituted harmful error because the extended interview contained repeated statements by the detective that Jackson was guilty. This Court observed that much of the interview did not result in obtaining any relevant responses from Jackson. *Id.* at 341. In determining that the admission of the interview constituted harmful error, this Court identified "some of the most problematic and prejudicial assertions" made by the detectives:

(1) "the only question I have is: Why did you kill her"; (2) "I know you did it. You used a fire extinguisher. I know you did it"; (3) "No. I'm saying something that you did do and you know in your heart you did it"; (4) "There's no doubt in my mind you did it, okay? There's no doubt"; (5) "You have no explanation of how you could have come inside her other than being there raping her and then consequently she dies"; (6) "Well now we're—you're putting us—you in a position where we're not—we don't have any answers for anybody other than 100 percent without a shadow of a doubt you killed Andrea Boyer and you raped her"; and (7) "Michael, you went to the clinic. You brutally raped this girl and you hit her multiple times in the head with a fire extinguisher. You left her there bleeding, half dressed for an employee to find her . . . ." Additionally, the detectives stated that Boyer "[wanted] to start a family," "her parents were very well-to-do," this is not the type of case where the victim "is a nobody," and Boyer was a "rising star in the community."

*Id.*

The statements in Bush's case do not rise to the level of prejudice established in *Jackson*. Detective Tice did not offer personal opinions of Bush's guilt. Rather, Tice asked Bush questions, presented Bush with some of the information he had, and confronted Bush with inconsistencies in an attempt to have Bush explain them.

Not only was the admission of the interviews proper, the trial court did not err in giving the series of standard jury instructions instead of the one requested by the defense. "In order to be entitled to a special jury instruction, [the defendant] must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or

confusing." *Stephens v. State*, 787 So. 2d 747, 756 (Fla. 2001) (footnotes omitted).

Here, Bush has not shown how the standard instructions failed to "cover the theory of defense" against what he considered to be loaded and prejudicial questions by Detective Tice. The standard jury instruction adequately provided that "opinions and statements [by law enforcement officers to the defendant] are pertinent only to explain the reactions and responses they elicit. You are not to consider these opinions and statements by the police officer as true, but only to establish the context of the defendant's reactions and responses." Fla. Std. Jury Instr. (Crim.) 2.8.

Moreover, the requested defense instruction contained inflammatory language in the form of multiple references to "false or misleading verbal subterfuge," which could confuse the jury and be considered a comment on the credibility of the law enforcement witness. Bush is not entitled to relief.

*5. Photographic Exhibit*

Bush argues that the trial court erred in admitting the photo overlay exhibit of Nicole's sofa. The exhibit was introduced to demonstrate the placement of the sofa cushion before and after Bush re-entered the townhome on the night of June 5 or early morning hours of June 6. Bush argues that the exhibit was improperly used as direct evidence of his guilt and was manipulated to lead the jurors to believe that the movement of the sofa cushion occurred in real time. The trial

court's decision to admit the exhibit is subject to the abuse of discretion standard. *See Cole v. State*, 701 So. 2d 845, 854 (Fla. 1997). The trial court did not abuse its discretion, and Bush is not entitled to relief.

The exhibit used two still photo images—the first captured on June 5 at 23:22:22, and the second captured on June 6 at 07:30:40—to illustrate that the sofa cushion was moved during the time that Bush had access to the townhome. Both images indicated the time and the date, and the jury saw each of these images first. Then, to illustrate the difference between the before and after images of the sofa, the jury was shown a brief video which shifts from the image captured on June 5 to the one captured on June 6.

Despite Bush's argument, the juxtaposition of the still images did not amount to an alteration or enhancement of what was originally visible, and the exhibit did not attempt to portray real-time movement. The images constitute true representations of the sofa on both the evening of June 5 and the morning of June 6 and were not misleading.

Additionally, the conclusion that the sofa cushion was moved was further substantiated by the testimony of Jim Stafford. Stafford, the managing member of Eclipse Forensics, used an arithmetic function within a program called Ocean

Systems to evaluate whether any objects in the surveillance video moved.[8] Using the before and after images of the sofa as well as measurements of the sofa, Stafford was able to determine that the sofa cushion had been moved 11 pixels, which translated into 2.31 inches. The trial court did not abuse its discretion in admitting the exhibit.

### 6. Spoliation Instruction

Bush sought a special jury instruction on spoliation of evidence because the underpants that Nicole wore at the time of the attack were not preserved as evidence and submitted for testing. Deputy Harris and paramedic Michelle Grant testified that when they arrived at the crime scene, Nicole was wearing only a bra and torn underpants.[9] Bush's requested jury instruction stated: "Evidence that Nicole Bush's undergarments were lost or not preserved by the State or its agents, including hospital staff and all police agencies, may be considered by a jury as sufficient and exculpatory evidence that would have shown that Sean Bush is not guilty of the crime charged." The trial court ruled that the instruction would not be given.

---

8. Ocean Systems is used by many law enforcement agencies, including the Federal Bureau of Investigation, Central Intelligence Agency, Drug Enforcement Agency, and National Geospatial-Intelligence Agency.

9. A sexual assault kit used to obtain evidence from Nicole's body did not reveal DNA foreign to Nicole, nor did it reveal the presence of semen.

Bush is not entitled to relief because he is unable to demonstrate that: "(1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing." *Stephens*, 787 So. 2d at 756.

Bush's requested instruction was not supported by the evidence, nor was it a correct statement of the law. While the underpants were not preserved, this point alone would not have been "sufficient and exculpatory evidence" of Bush's innocence. Moreover, the requested instruction is misleading because the term "sufficient" would have suggested to the jury that the State's failure to preserve the underpants overrode all other evidence presented at trial. Further, any argument that the underpants would have provided additional evidentiary benefit is speculative. Results from the sexual assault kit were negative both for DNA foreign to Nicole and for the presence of semen. Bush was not entitled to the special instruction.

### 7. Guilt Phase Closing Argument

During closing argument, defense counsel attempted to argue that the anonymous call Bush received about Nicole's insurance policy might not have been placed by a coworker, but rather by detectives who needed a financial motive to establish their case against Bush. Upon the State's objection and following a

sidebar, the trial court determined that the evidence presented at trial did not support the defense claim that the anonymous call was made by law enforcement. The court prohibited defense counsel from proceeding with the argument, and it instructed the jury to disregard it. On appeal, Bush contends that the trial court denied him an adequate opportunity to challenge during closing the State's theory of his motive to kill Nicole.

"[T]he role of counsel in closing argument is to assist the jury in analyzing [the] evidence" presented at trial. *Ruiz v. State*, 743 So. 2d 1, 4 (Fla. 1999). Attorneys are permitted wide latitude in closing arguments but are not permitted to make improper argument. *Gore v. State*, 719 So. 2d 1197, 1200 (Fla. 1998); *see Bigham v. State*, 995 So. 2d 207, 214 (Fla. 2008) (holding that arguments on matters outside the evidence are improper). It is within the trial judge's discretion to determine when an attorney's argument is improper, and such determination will not be upset absent abuse of discretion by the lower court judge. *Bigham*, 995 So. 2d at 215. "A trial court has discretion in controlling opening and closing statements, and its decisions will not be overturned absent an abuse of discretion." *Merck v. State*, 975 So. 2d 1054, 1061 (Fla. 2007) (citing *Dufour v. State*, 905 So. 2d 42, 64 (Fla. 2005)).

The trial court did not abuse its discretion by limiting counsel's argument. There was no evidence from which a jury could reasonably connect the detectives,

or the investigation into Nicole's murder, to the phone call. Moreover, the defense had ample opportunity to rebut the State's theory of financial motive throughout the trial and at closing. Defense counsel cross-examined Kristi Nieman, the records custodian for Securian Financial Group, which is affiliated with Minnesota Life Insurance Company. The cross-examination elicited testimony about Nicole's ability and opportunity to change the beneficiary of the life insurance policy after her separation from Bush. Nieman's testimony on this point questioned whether Bush knew that he was still a beneficiary of the life insurance policy. During closing, defense counsel noted that several weeks passed before Bush made the claim against Nicole's insurance policy. Defense counsel argued, without objection from the State, that Bush filed the claim after he received the anonymous phone call regarding Nicole's policy.

The trial court did not abuse its discretion in limiting the scope of Bush's closing argument.

### 8. Penalty Phase Jury Instructions

In April 2017, following this Court's decision in *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from by State v. Poole*, 45 Fla. L. Weekly S41 (Fla. Jan. 23, 2020), *clarified*, 45 Fla. L. Weekly S121 (Fla. Apr. 2, 2020), this Court authorized interim jury instructions to be used in the penalty phase of capital cases. *See In re Std. Crim. Jury Instrs. in Capital Cases*, 214 So. 3d 1236 (Fla. 2017).

These instructions were given at Bush's trial in August 2017.  This Court further amended the instructions in 2018.  *See In re Std. Crim. Jury Instrs. in Capital Cases*, 244 So. 3d 172 (Fla. 2018).  Bush now challenges the use of the 2017 interim instructions during his penalty phase.  As we explain below, his claims regarding the 2017 interim instructions are without merit.

### A. *Language Regarding the Jury's Recommendation*

Bush's first challenge involves language contained in interim instruction 7.11, Preliminary Instructions in Penalty Proceedings—Capital Cases.  In two places during the initial penalty phase instructions, the language contained a reference to a jury recommendation: (1) "An aggravating factor is a standard to guide the jury in making the choice between recommending life imprisonment without the possibility of parole or death."; (2) "Should you find sufficient aggravating factors do exist to justify recommending the imposition of the death penalty, it will then be your duty to determine whether the aggravating factors that you unanimously find to have been proven beyond a reasonable doubt outweigh the mitigating circumstances that you find to have been established."  Additionally, the prosecutor said the following during closing arguments: "So let's talk about aggravating factors.  An aggravating factor is a standard to guide the jury in making the choice between recommending life imprisonment without the possibility of parole or death."  Bush argues that this language did not adequately

inform the jury of its responsibility in deciding Bush's sentence. This argument has no merit.

Bush's argument is consistent with similar challenges based on *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985) ("[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere."). This Court has repeatedly held that claims challenging the constitutionality of Florida's standard jury instructions given in capital cases that refer to the jury's advisory role and to their sentencing verdict as a recommendation under *Caldwell* are meritless: "*Hurst*-induced *Caldwell* claims against the standard jury instruction do not provide an avenue for *Hurst* relief." *Reynolds v. State*, 251 So. 3d 811, 828 (Fla. 2018) (concluding "beyond a reasonable doubt that the jury was properly instructed under the existing law in a manner that underscored 'their power to determine the appropriateness of death as an "awesome responsibility." ' " (quoting *Caldwell*, 472 U.S. at 330)).

The limited references to a jury recommendation were insufficient to diminish the jury's understanding of its role in the sentencing process. The jury was instructed: "It's now your duty to make a decision as to the appropriate sentence that should be imposed upon the defendant for the crime of first-degree murder. There are two possible punishments: life imprisonment without the

possibility of parole or death." There is no merit in Bush's argument that the jury was misled as to its role in his sentencing.

What is more, unlike *Reynolds*, where the pre-*Hurst* jury instructions stated that the sentence was advisory, the interim instructions used during Bush's post-*Hurst* penalty phase did not refer to an advisory sentence. Thus, Bush's argument is even weaker than that which we have consistently rejected under the old jury instructions. As a result, Bush is not entitled to relief.

*B. Sympathy and Mercy Instructions*

Bush's second argument is twofold: (1) that he was deprived of a jury consideration of sympathy, and (2) the jury did not receive a mercy instruction. Neither argument has merit.

During the final jury instructions, as provided in interim jury instruction 7.11(a), the jury was told: "Your decisions should not be influenced by feelings of prejudice, racial or ethnic bias, or sympathy. Your decisions must be based on the evidence and law contained in these instructions." *See* Fla. Std. Jury Instr. (Crim.) 7.11(a) (2017). However, the instruction as amended in 2018 did not include the word "sympathy."

Bush argues that because his jury was instructed to not consider sympathy, he is entitled to relief. However, his argument that his jury was deprived of an opportunity to consider sympathy is without merit. As Bush concedes, defense

- 63 -

counsel was permitted to argue sympathy during the penalty phase closing arguments.

Similarly, Bush's argument that he was entitled to a jury instruction on mercy is also without merit. Before trial, defense counsel filed a written motion seeking a mercy instruction, and the trial court held an evidentiary hearing. The court entered a written order denying the motion, concluding that the standard jury instruction on nonstatutory mitigating circumstances was adequate.

The trial court's ruling is consistent with this Court's precedent rejecting claims of entitlement to an instruction on mercy. *See Downs v. Moore*, 801 So. 2d 906, 913 (Fla. 2001) (rejecting Downs' claim that he was entitled to a mercy instruction and stating that "[t]his Court has held that the 'catch-all' standard jury instruction on nonstatutory mitigation when coupled with counsel's right to argue mitigation is sufficient to advise the jury on nonstatutory mitigating circumstances").

*C. Burden-Shifting Argument*

Bush's third argument suggests that this Court may wish to reconsider whether the penalty phase jury instructions improperly shift the burden to the defense. This Court has previously addressed this issue, and we decline to reconsider it. *See Rogers v. State*, 957 So. 2d 538, 555 (Fla. 2007) ("[T]he standard penalty phase jury instructions do not 'impermissibly shift the burden to

the defense to prove that death is not the appropriate sentence.' " (quoting *Taylor v. State*, 937 So. 2d 590, 599 (Fla. 2006)). Bush is not entitled to relief.

### 9. Fundamental Error in Penalty Phase Jury Instructions

Bush also claims that his penalty phase instructions were fundamentally erroneous. However, this argument is without merit. His first argument regarding the definition of mitigation merely speculates that a juror's views might be trampled upon by others if not deemed reasonable by the other jurors. This argument does not demonstrate any error—let alone fundamental error—sufficient to vitiate Bush's death sentence. Bush's second argument, that the interim instructions did not require individual findings on mitigating circumstances, is also without merit. In fact, even though the jury was not required to make individual findings as to mitigating circumstances, the verdict form in this case did require the jury to indicate the jury vote for each mitigating circumstance. The record demonstrates that the jury understood its responsibility in considering the mitigating circumstances that Bush sought to prove. Bush's claim of fundamental error does not warrant relief.

### 10. Penalty Phase Closing Arguments

Bush argues that the trial court erred in overruling defense counsel's objections during the State's closing argument, and he also raises a claim of fundamental error based on a prosecutorial comment that was not objected to. In

this case, neither the objected-to nor the unobjected-to comments entitle Bush to relief.

## A. *Objected-to Comments*

We first turn to the closing argument claims that Bush preserved for appellate review by raising contemporaneous objections. Throughout the State's closing argument, defense counsel made repeated objections to the prosecutor's comments. Most commonly, the defense argued that the State improperly characterized various mitigating circumstances as aggravation. With one exception where a curative instruction was given, the trial court overruled the defense objections. On appeal, Bush argues that the trial court erred in overruling the objections. However, our careful review of the prosecutor's closing argument reveals that when analyzing various mitigating circumstances, the prosecutor consistently framed his comments in terms of the amount of weight that the jury should assign. For example:

> **Prosecutor:** He had a strong work ethic, useful occupation, and a strong skill set.
> See, all of this, ladies and gentlemen, when you're back there, you're deciding, number one, is this a mitigating circumstance.
> And then the second part of that is, how much weight should I give it?
> So when you consider the evidence, how much weight you should give, you may—you may find that all of the stuff from his childhood, that's a mitigator. I agree. That's a mitigator.
> But when you—how much weight do you give it when you know that the defendant pulled himself up out of—he had the ability to pull himself out of all of that stuff from his childhood and graduate

- 66 -

from high school, get an—a certificate in IT, and have a good job, consistently employed, strong work ethic?

Those are the things that you can consider in deciding how much weight to give those mitigating circumstances. Leadership qualities, we heard testimony he can help mentor others to take different paths or improve themselves, that he was helpful to other inmates in the St. Johns County Jail, and that he was a positive influence on others.

One of the things that you can consider in how much weight to give those mitigators is why wasn't he doing that before?

**Defense Counsel:** Objection, your Honor. Arguing an aggra— a mitigator is an aggravator again.

**The Court:** Overruled.

**Prosecutor:** Again, how much weight do you give this?

Such arguments, made in the context of the jury's weighing process, do not argue mitigating circumstances as aggravation but instead comment on the appropriate weight they should be assigned in light of the evidence presented.

Additionally, Bush argues that the prosecutor made an improper argument when he said, "That's not fair to you [the jury]." In context, the prosecutor was arguing against the mitigating circumstance that Bush has a family that loves and cares about him and supports him. The prosecutor cautioned the jury against being concerned about Bush's family when considering this mitigation:

**Defense Counsel:** It is up to you to decide whether or not that is a mitigating factor and, if it is, how much weight to give it.

And here's what's going on with that argument because what happens—what invariably happens when you're thinking about the family that's damaged by his bad choices, what begins to happen in the jury room is you begin to think about your decision, about what that's—how that's going to impact other people.

And, again, sympathy, as the judge says, cannot be a part of this process.

> And what happens is it shifts the responsibility of the consequences of his decision from his shoulders to you.
>
> **Defense Counsel:** Objection, your Honor. He's arguing a nonenumerated aggravator, and he's trying to argue that the mitigation evidence is an aggravator in the case.
>
> **The Court:** Overruled. I just want to hear the legal objections, not speeches. The objection is overruled.
>
> **Prosecutor:** It shifts it to you, and that's not fair to you.
>
> None of you asked to be here. You received a summons from this Court to come for jury selection.
>
> And you sat through two days of lawyers asking you questions about your life to decide if you're appropriate for this jury.
>
> And then you didn't get a choice whether or not you were on this jury. You were told you were the jury.
>
> And you didn't ask to have to come listen to evidence of this crime and to sit here for days and weeks to listen to the evidence in this case. You didn't have a choice. So it's not fair to you to shift that burden to you.

Bush claims that these comments improperly denigrated defense counsel as manipulative. However, these are not inflammatory comments such as, "the defense using a 'diversionary tactic,' putting on a 'magnificent display,' or 'cloud[ing]' and 'muddl[ing]' the issues" that this Court deemed improper in *Cardona v. State*, 185 So. 3d 514, 524-25 (Fla. 2016). Rather, the comments, cautioning the jury about feeling sorry for Bush's family or being concerned with the impact of Bush's sentence upon his family, fell within the scope of proper advocacy.

### B. Unobjected-to Comments

Bush also challenges comments that were not objected to during closing argument. In the absence of a contemporaneous objection, relief is not appropriate

unless the complained-of comments constitute fundamental error. Fundamental error "reaches down into the validity of the trial itself to the extent that a verdict of guilty or jury recommendation of death could not have been obtained without the assistance of the alleged error." *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001). As explained below, fundamental error did not occur in this case.

At the end of his closing argument, the prosecutor said:

> For Nicole Bush, life did not get to mean life. Life did not get to mean life.
> I don't pretend that it's easy, but the right decisions in life are not often easy.
> The right decisions in life are often hard, and they require courage to make them.
> I ask each of you, each and every one of you, the 12 individuals who are going to decide this case, each and every—all 12 of you, because that's what is required. It requires 12 of you.
> If one of you decide[s] no, then Sean Bush does not get the death penalty. That's what the judge will tell you.
> I'm asking each of you to do the hard thing, but the right thing, to have the courage to return a verdict that, yes, there are aggravating factors in this case that have been proven beyond a reasonable doubt; that, yes, those aggravating factors are sufficient to warrant imposition of the death penalty; that, yes, those aggravating factors outweigh the mitigating factors; and that, yes, the death penalty should be imposed in this case.
> Thank you.

Bush cites this Court's decision in *Urbin v. State*, 714 So. 2d 411, 421 (Fla. 1998), in support of his claim that the prosecutor's statement amounted to fundamental error. However, this case is distinguishable from *Urbin*, in which this Court observed that "so many of these instances of misconduct are literally

- 69 -

verbatim examples of conduct we have unambiguously prohibited." *Id.* at 422. In *Urbin*, after suggesting that the jury should not recommend a life sentence because the law might change and Urbin might receive parole someday, the prosecutor told the jury he was concerned "that some of you may be tempted to take the easy way out, to not weigh the aggravating circumstances and the mitigating circumstances and not want to fully carry out your responsibility and just vote for life." *Id.* at 421. The prosecutor further engaged in the "same mercy" argument, asking the jury to show Urbin the same mercy that he showed the victim. *Id.* These comments led this Court to engage in an extended discussion of the prosecutor's improper closing argument, although it reversed Urbin's death sentence on proportionality grounds. *Id.* at 418-19.

In the present case, the prosecutor's argument does not rise to the level of fundamental error. Given the extremely weighty aggravation in this case, the prosecutor's comments do not constitute fundamental error such that Bush's death sentence could not have been obtained without them. However, we are concerned with the prosecutor's appeal to the jurors "to have the courage" to impose the death penalty. In the strongest terms, we urge prosecutors to avoid such argument, and we remind them of their solemn obligation "to seek only justice when life or death may be at stake." *Doorbal v. State*, 837 So. 2d 940, 957 (Fla. 2003).

### 11. Victim Impact Testimony

Bush further argues that the trial court erred when it denied defense counsel's motions to declare unconstitutional the statute that permits victim impact testimony, and to limit the amount of victim impact evidence admitted. As a threshold matter, we reject Bush's claim that the statute permitting victim impact evidence is unconstitutional. "Evidence of a family member's grief and suffering due to the loss of the victim is evidence of 'the resultant loss to the community's members by the victim's death' permitted by section 921.141(7), and the admission of such evidence is consistent with the Supreme Court's decision in *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991)." *Victorino v. State*, 127 So. 3d 478, 496 (Fla. 2013).[10]

The United States Supreme Court held in *Payne* that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Payne*, 501 U.S. at 827. Moreover, this Court concluded that "[s]uch evidence is also protected by article I,

10. The statute permitting victim impact evidence was renumbered in 2016 and is now codified in section 921.141(8), Florida Statutes (2019). *See* ch. 2016-13, § 3, Laws of Fla.

section 16 of the Florida Constitution," which pertains to the rights of accused individuals and of crime victims. *Baker v. State*, 71 So. 3d 802, 817 (Fla. 2011).

Having rejected Bush's challenge to the constitutionality of victim impact evidence, we now turn to his argument regarding the victim impact evidence admitted during his trial. Before the admission of the victim impact testimony from Nicole's mother, sister, and best friend, the trial court carefully reviewed the contents of the proposed statements in the presence of both parties. The trial court sustained multiple objections and overruled others, granting defense counsel's requests for certain redactions. The trial court instructed the jury with the standard jury instruction on victim impact testimony, including the instruction that victim impact testimony was not to be used for finding aggravation and was not to be considered as an aggravating factor. The redacted versions of the victim impact testimony that were published to the jury described Nicole as a loving mother, daughter, sister, aunt, friend, and coworker, and described the impact of her loss.

Bush's challenge is without merit. The victim impact testimony stayed within its proper scope, describing Nicole's uniqueness as an individual and the resultant loss to the community. Moreover, the penalty phase testimony was limited to three witnesses: her mother, sister, and best friend. In *Deparvine v. State*, 995 So. 2d 351, 378 (Fla. 2008), the testimony of five victim impact witnesses was found admissible. *See also Farina v. State*, 801 So. 2d 44, 52 (Fla.

2001) (concluding no error in the admission of victim impact testimony of twelve witnesses). Bush is not entitled to relief.

### 12. Cumulative Error

Bush claims that he was denied a fair penalty phase due to cumulative error. "However, where the individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error also necessarily fails." *Israel v. State*, 985 So. 2d 510, 520 (Fla. 2008) (quoting *Parker v. State*, 904 So. 2d 370, 380 (Fla. 2005)). Bush's individual claims of penalty phase error are without merit. Therefore, he is not entitled to relief.

### 13. Constitutionality of the Death Penalty

Citing the number of aggravating factors provided in Florida's death penalty scheme, Bush argues that Florida's death penalty statute is unconstitutional because it does not sufficiently narrow the class of individuals who are eligible to receive the death penalty. In particular, he challenges the State's ability to rely on a contemporaneous crime to satisfy the prior violent felony aggravator, and the ability to establish the CCP aggravator with proof of premeditation formed shortly before the murder.

This Court has rejected similar arguments. Specifically, "[t]his Court has rejected the argument that Florida's capital sentencing scheme is unconstitutional because it provides for an automatic aggravating circumstance and neither

'narrow[s] the class of persons eligible for the death penalty' nor 'reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' " *Miller v. State*, 926 So. 2d 1243, 1260 (Fla. 2006) (quoting *Parker v. State*, 873 So. 2d 270, 286 n.12 (Fla. 2004) (alterations in original)); *see Blanco v. State*, 706 So. 2d 7, 11 (Fla. 1997) (rejecting Blanco's argument that the murder-in-the-course-of-a-felony aggravator does not sufficiently narrow the class of death penalty-eligible individuals). Bush is not entitled to relief.

Moreover, the instances that Bush uses to support his argument are inapplicable in this case. Although felony murder is a statutory basis for a conviction of first-degree murder where a defendant is convicted of an underlying predicate felony, Bush was convicted under both the felony and premeditated murder theories. Also, while it is true that contemporaneous crimes may be used to satisfy the prior violent felony aggravator, the prior violent felony in this case was Bush's conviction for aggravated assault after he threw an electrified rod into the water-filled bathtub containing his unsuspecting then-wife, Cherise Conte-Bush. Further, his argument that the CCP aggravator cannot be based on premeditation formed shortly before the murder is inapposite to this case, where Bush researched silencers and .22 caliber suppressors months before the murder, coordinated keeping his children and the family dog at his home so that they would

not be at the townhome during the attack, drove thirty minutes to Nicole's neighborhood, parked his van in a location where he would avoid being seen, walked to Nicole's townhome, and disarmed the alarm panel before attacking her. Bush's argument is without merit.

### *14. Proportionality*

Although Bush does not argue proportionality, this Court is required to conduct "a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence." *Offord v. State*, 959 So. 2d 187, 191 (Fla. 2007) (quoting *Anderson v. State*, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a qualitative review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " *Id.* (quoting *Urbin*, 714 So. 2d at 417.

This five-aggravator death case (HAC, CCP, prior violent felony, murder during the commission of a burglary, and murder committed for pecuniary gain) is among the most aggravated and least mitigated and is proportionate to other cases where the death sentence has been imposed. Three of the aggravating circumstances found in this case, HAC, CCP, and prior violent felony, have repeatedly been identified by this Court as among the most serious aggravating factors. *See Damas v. State*, 260 So. 3d 200, 216 (Fla. 2018); *Larkins v. State*, 739

So. 2d 90, 95 (Fla. 1999). In particular, "when [HAC and CCP] are present, the mitigating circumstances must be of considerable weight to overcome them." *Brown v. State*, 143 So. 3d 392, 405-06 (Fla.) (citing *Abdool v. State*, 53 So. 3d 208, 224 (Fla. 2010)), *cert. denied*, 574 U.S. 1034 (2014).

This Court upheld a defendant's death sentence in *Beasley v. State*, 774 So. 2d 649 (Fla. 2000), where the victim also suffered a sustained brutal attack. In *Beasley*, the victim was viciously bludgeoned with a hammer, and she was conscious while she tried to defend herself. This Court upheld the defendant's death sentence despite a lengthy list of mitigating factors and "conclude[d] that the death penalty imposed here for this particularly brutal murder is proportionate when compared with other cases in which a death sentence has been upheld." *Id.* at 675.

Like the victim in *Beasley*, Nicole Bush was the victim of a "particularly brutal murder." Despite the six gunshots, followed by being beaten with an aluminum baseball bat and being stabbed multiple times, she somehow survived for almost three hours. Moreover, the medical examiner testified that Nicole would have been conscious through much of her attack.

Although the trial court found and assigned varying weight to all thirty-four of Bush's nonstatutory mitigating circumstances, they simply do not overcome the

five weighty aggravating circumstances, each of which was assigned great weight.

Bush's death sentence is proportionate.

## CONCLUSION

For these reasons, we affirm Bush's convictions and sentence of death.

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, and MUÑIZ, JJ., concur.
LABARGA, J., concurs in part and dissents in part with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND,
IF FILED, DETERMINED.

LABARGA, J., concurring in part and dissenting in part.

Although I recognize that the majority's decision—to discard Florida's long-settled heightened standard of review in wholly circumstantial evidence cases—finds support in the law of other state courts and the federal courts, I remain convinced that Florida's appellate courts should undertake the review of such cases with as much caution as the law permits. I dissent to the majority's sweeping decision to abandon the heightened standard of review in all criminal cases that are based solely on circumstantial evidence.

For more than one hundred years, this Court has applied a more stringent standard of review in reviewing convictions supported only by circumstantial evidence. We have explained:

> Evidence which furnishes nothing stronger than a suspicion,
> even though it would tend to justify the suspicion that the defendant

committed the crime, . . . is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict. Circumstantial evidence which leaves uncertain several hypotheses, any one of which may be sound and some of which may be entirely consistent with innocence, is not adequate to sustain a verdict of guilt. Even though the circumstantial evidence is sufficient to suggest a probability of guilt, it is not thereby adequate to support a conviction if it is likewise consistent with a reasonable hypothesis of innocence.

*Ballard v. State*, 923 So. 2d 475, 482 (Fla. 2006) (quoting *Davis v. State*, 90 So. 2d 629, 631-32 (Fla. 1956)). This heightened standard has proved workable as this Court has conducted its mandatory review of sufficiency of the evidence in death penalty cases and has not yielded one-sided results. Indeed, if this standard were applied to the facts currently before this Court, Bush's conviction for first-degree murder would be affirmed. Yet today, this Court eliminates another reasonable safeguard in our death penalty jurisprudence and in Florida's criminal law across the board.

Circumstantial evidence is a vital evidentiary tool, and the admission of such evidence is commonly relied on by the State to establish its case-in-chief. However, circumstantial evidence is inherently different from direct evidence in a manner that warrants heightened consideration on appellate review. "Direct evidence is that to which the witness testifies of his own knowledge as to the facts at issue. Circumstantial evidence is proof of certain facts and circumstances from which the trier of fact may infer that the ultimate facts in dispute existed or did not

exist." *Davis*, 90 So. 2d at 631. "While the two types of evidence are equally probative, one requires a leap in reasoning that the other does not. They are fundamentally different." *Easlick v. State*, 90 P.3d 556, 560 (Okla. Crim. App. 2004) (Chapel, J., dissenting). To that end, applying a heightened standard of review to wholly circumstantial cases is necessary to avoid what this Court described as follows: "Only by pyramiding assumption upon assumption and intent upon intent can the conclusion necessary for conviction be reached." *Gustine v. State*, 97 So. 207, 208 (Fla. 1923).

Although this Court eliminated the standard criminal jury instruction on circumstantial evidence in 1981, we have since then expressly rejected the invitation to abandon the heightened standard of review of sufficiency of the evidence in wholly circumstantial cases because the standard "guards against basing a conviction on impermissibly stacked inferences." *Miller v. State*, 770 So. 2d 1144, 1149 (Fla. 2000); *see also State v. Law*, 559 So. 2d 187, 188-89 (Fla. 1989). "[W]hile the reasonable doubt [jury] charge and the *Jackson* [*v. Virginia*, 443 U.S. 307 (1979)] sufficiency standard may be all that is constitutionally required as a matter of due process, the states are free to go above this rudimentary constitutional floor in order to guard against wrongful convictions." Irene Merker Rosenberg & Yale L. Rosenberg, "*Perhaps What Ye Say Is Based Only On Conjecture*"—*Circumstantial Evidence, Then and Now*, 31 Hous. L. Rev. 1371,

1421 (1995).[11]  As this Court has observed, "we have the duty to *independently* examine and determine questions of state law so long as we do not run afoul of federal constitutional protections or the provisions of the Florida Constitution that require us to apply federal law in state-law contexts."  *State v. Kelly*, 999 So. 2d 1029, 1043 (Fla. 2008).  In applying the heightened standard of review in wholly circumstantial cases, this Court does neither.

The solemn duty imposed upon this Court in reviewing death cases more than justifies the stringent review that has historically been applied in cases based solely on circumstantial evidence.  In the present case, the evidence relied on to convict Bush satisfies the more exacting standard of review and is inconsistent with Bush's hypothesis of innocence that someone else committed the murder.  Thus, I concur in the result.

---

11.  In *Jackson*, the United States Supreme Court held that in a federal habeas proceeding reviewing a state criminal conviction for sufficiency of the evidence, "if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  443 U.S. at 324.  Florida has long applied this standard when reviewing sufficiency of the evidence in cases not based solely on circumstantial evidence.  *See, e.g.*, *Melendez v. State*, 498 So. 2d 1258, 1261 (Fla. 1986).

However, for the reasons expressed, I dissent to the majority's decision to change settled Florida law in criminal cases and abandon the reasonable safeguard provided by the heightened sufficiency of the evidence standard.

An Appeal from the Circuit Court in and for St. Johns County,
        Howard M. Maltz, Judge - Case No. 552011CF001604XXAXMX

James S. Purdy, Public Defender, Raymond M. Warren and Nancy Jean Ryan, Assistant Public Defenders, Seventh Judicial Circuit, Daytona Beach, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee